

# In the United States Court of Federal Claims

No. 13-248 C

(Filed February 12, 2014)

**UNPUBLISHED**

**FILED**

FEB 1 2 2014

U.S. COURT OF
FEDERAL CLAIMS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

MARY V. MILLER TURNER,

    *Pro Se Plaintiff*,

    v.

THE UNITED STATES,

    *Defendant*.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Contract; *Pro Se* Complaint;
Motion to Dismiss for Lack of
Subject Matter Jurisdiction,
RCFC 12(b)(1).

*Mary V. Miller Turner*, Philadelphia, PA, *pro se*.

*Lauren S. Moore*, United States Department of Justice, with whom were *Stuart F. Delery*, Assistant Attorney General, *Bryant G. Snee*, Acting Director, *Scott D. Austin*, Assistant Director, Washington, DC, for defendant. *Gabriel A. Hindin*, Office of the Comptroller of the Currency, Washington, DC, of counsel.

---

## OPINION

---

**BUSH,** *Senior Judge.*

Now pending before the court is defendant's motion to dismiss plaintiff Mary Miller Turner's *pro se* amended complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC). Defendant's motion has been fully briefed and is ripe for a decision by the court. For the reasons discussed below, the court concludes that

it lacks jurisdiction over Ms. Turner's claim and therefore grants defendant's motion to dismiss.

## BACKGROUND[1]

In her *pro se* amended complaint filed August 5, 2013, Ms. Turner alleges that the Department of the Treasury, Office of the Comptroller of the Currency (the OCC) owes her a wire transfer in the amount of $1,850,000.00 pursuant to an implied-in-fact contract between Ms. Turner and the OCC. Ms. Turner alleges that the OCC is in breach of that alleged contract, and requests that this court "[c]ompel the [OCC] to release a wire, which represents personal property of the Plaintiff, for the total sum of $1,850,000.00 USD to her [bank] account . . . in accord[ance] with the jurisdiction of the court as described in 28 U.S.C. § 1491." Am. Compl. at 1.[2] Additionally, she requests an award of "interest . . . at the reasonable rate of 3.68% which would accrue [at] an annual rate of $68,080.00." *Id.* ¶ 11.

The government, in its motion to dismiss, aptly summarizes the salient factual allegations set forth in Ms. Turner's amended complaint:

> Ms. Turner alleges that the OCC "contacted [her] and informed her that a wire directed to her was within their possession and requested the completion of an Application for Clearance on Legitimacy of Funds." Am. Compl. ¶ 1. Ms. Turner alleges that she complied with the OCC's request, completed the application, and wired the required fee of $420.00 to the appropriate account. *Id.* Thereafter, Ms. Turner alleges, the OCC notified her "that the International Monetary Fund (IMF)

[1] The facts recited here, taken from plaintiff's amended complaint and the parties' submissions in connection with defendant's motion to dismiss, are undisputed unless otherwise indicated.

[2] Ms. Turner filed her original complaint on April 8, 2013. The government moved to dismiss the complaint for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1) on July 8, 2013, asserting that plaintiff failed to allege any money-mandating source of law sufficient to confer jurisdiction on this court. Rather than respond to the government's motion to dismiss, plaintiff instead filed a motion to amend her complaint, which the court granted on August 5, 2013 while simultaneously denying defendant's motion to dismiss as moot.

2

put a stop order on the wire for payment of Currency Fluctuation Charges in the amount of $3,700.00." *Id.* Ms. Turner states that the OCC provided her with a letter from the IMF, stating that she was entitled to receive $1,8[5]0,000.00 after the $3,700.00 payment was made. *Id.* Ms. Turner asserts that she made the $3,700.00 payment, received a receipt for the payment from the OCC, but that Timothy Long, "Assistant Deputy Chief Council" at the OCC, failed to forward this payment to the IMF. [*Id.*] ¶ 3. Ms. Turner states that "Mr. Timothy Long's refusal to pay the IMF the $3,700.00 placed the [OCC] in breach of the implied[-]in-fact contract and is liable for the damage[] that the Plaintiff has sustained due to his negligence and attempt to hold the Plaintiff responsible for the outstanding fee as stated in the fraudulent case against the Plaintiff." [*Id.*] Ms. Turner alleges that Mr. Long's failure to forward her payment to the IMF to remove the [stop order] "places the [OCC] in breach of the implied-in-fact contract." [*Id.*] ¶ 10.

. . . .

The stated purpose of Ms. Turner's amended complaint is, among other things, to compel the OCC to release a monetary wire transfer, which she alleges represents her personal property, in the sum of $1,850,000.00. Am. Compl. ¶ 11. She claims that she made the appropriate payment to the IMF, but that, instead of the release of the wire as guaranteed by the IMF, she received a receipt for a partial payment with a balance due of $15,859.00. [*Id.*] ¶ 2. Ms. Turner's amended complaint alleges that she entered into an implied-in-fact contract with the OCC . . . that provides this Court with jurisdiction to entertain her claim seeking an order requiring the OCC to release the monetary sum that she requests. Ms. Turner asserts that, because Mr. Timothy Long, an employee at the OCC, breached the

3

> alleged implied-in-fact contract, she is owed money
> damages in the amount of $1,850,000.00.

Def.'s Mot. at 3-4, 9-10.[3]

In support of these allegations, Ms. Turner filed an appendix in which she included copies of several documents purporting to be official OCC documents.[4] Included in Ms. Turner's appendix is a document purporting to be an OCC "Payment Voucher" dated March 5, 2013 and allegedly prepared by Mr. Long. Compl. App. A-3. This document purports to authorize an "[e]xpress swift wire transfer of inheritance sum of $1,850,000.00" to Ms. Turner, and is ostensibly approved by an individual named "Clarence Frank." *Id.* In addition, Ms. Turner includes in her appendix a document titled "Application for Clearance on Legitimacy of Funds," which she allegedly submitted at the OCC's behest on or about February 20, 2013, *id.* at A-1, as well as documents purporting to be OCC-issued "[r]eceipt[s]" reflecting payments of $420.00 and $3,700.00 allegedly made by Ms. Turner in or about March 2013, *id.* at A-2, A-8. Finally, Ms. Turner includes a photocopy of an OCC identification card purportedly belonging to Mr. Long. *Id.* at A-15.

Defendant filed a motion to dismiss the amended complaint on September 16, 2013. In its motion, the government argues that this court lacks subject matter jurisdiction over plaintiff's claim because plaintiff has not sufficiently alleged the existence of a contract between herself and the United States. Plaintiff filed her response on December 18, 2013, and the government filed its reply on January 16, 2014.

---

[3] Although not necessarily germane to the government's pending motion to dismiss, the court notes that, by Ms. Turner's own admission, this is not the first time plaintiff has submitted payments in the thousands of dollars in the hope of receiving a wire transfer in the millions of dollars. In her amended complaint, Ms. Turner alleges that, in 2007, she "purchased a Judicial Clearance Certificate (JCC) for the sum of $1,200.00" to receive a wire transfer of $1,800,000.00 from the Nigerian government. Am. Compl. ¶ 5. Ms. Turner apparently never received that wire, however, as it was "not released due to a stop order by Abbey Bank in London." *Id.*

[4] Ms. Turner filed her appendix on April 8, 2013 along with her original complaint. She did not file an appendix to her amended complaint. Thus, all references to Ms. Turner's appendix refer to the appendix filed on April 8, 2013. The court will henceforth refer to Ms. Turner's appendix as "Compl. App."

## DISCUSSION

### I.    *Pro Se* Litigants

The court acknowledges that Ms. Turner is proceeding *pro se*, and is "not expected to frame issues with the precision of a common law pleading." *Roche v. United States Postal Serv.*, 828 F.2d 1555, 1558 (Fed. Cir. 1987). *Pro se* plaintiffs are entitled to a liberal construction of their pleadings. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (requiring that allegations contained in a *pro se* complaint be held to "less stringent standards than formal pleadings drafted by lawyers"). Accordingly, the court has examined the amended complaint and briefs thoroughly and has attempted to discern all of plaintiff's legal arguments.[5]

### II.    RCFC 12(b)(1) Motions to Dismiss

The relevant issue in a motion to dismiss under RCFC 12(b)(1) "'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Patton v. United States*, 64 Fed. Cl. 768, 773 (2005) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982)). In considering the issue of subject matter jurisdiction, this court must presume all undisputed factual allegations to be true and construe all reasonable inferences in favor of the plaintiff. *Scheuer*, 416 U.S. at 236; *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988) (citations omitted).

Where the court's jurisdiction is challenged, the plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence and by presenting competent proof. *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (citing *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298

---

[5]/  In this regard, the court notes that plaintiff submitted on January 24, 2014 a document titled "Request to Include the Declaratory Statement of Lucinda MP Umiamaka into the Record." The Clerk's Office stated that this submission was defective because no provision of the court's rules allow for the filing of such a document. The matter was referred to the undersigned for a ruling. On February 6, 2014, the court granted plaintiff's request and deemed the submission to be filed as a motion for leave to include Ms. Umiamaka's declaration as an enclosure to plaintiff's response to defendant's motion to dismiss. In rendering a decision on defendant's motion to dismiss, the court has considered each of plaintiff's submissions, including the document submitted by Ms. Turner on January 24, 2014 and filed on February 6, 2014.

U.S. 178, 189 (1936)); *Reynolds*, 846 F.2d at 748 (citations omitted). If the plaintiff fails to meet its burden, and jurisdiction is therefore found to be lacking, the court must dismiss the action. RCFC 12(h)(3).

In considering a motion to dismiss for lack of subject matter jurisdiction which challenges the truth of jurisdictional facts alleged in the complaint, the court may make findings of fact pertinent to its jurisdiction. *Ferreiro v. United States*, 350 F.3d 1318, 1324 (Fed. Cir. 2003) (citing *Moyer v. United States*, 190 F.3d 1314, 1318 (Fed. Cir. 1999), and *Reynolds*, 846 F.2d at 747); *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991) ("In determining whether a motion to dismiss should be granted, the Claims Court may find it necessary to inquire into jurisdictional facts that are disputed."). In making findings of fact pertinent to its jurisdiction, the court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings, including declarations or affidavits. *Rocovich*, 933 F.2d at 994 (citing *Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947), and *Reynolds*, 846 F.2d at 747).

## III.   Tucker Act Jurisdiction

Pursuant to the Tucker Act, the United States Court of Federal Claims has jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2012). The Tucker Act, however, "does not create any substantive right enforceable against the United States for money damages" but "merely confers jurisdiction upon it whenever the substantive right exists." *United States v. Testan*, 424 U.S. 392, 398 (1976) (citation omitted). A plaintiff coming before this court, therefore, must identify a separate provision of law conferring a substantive right for money damages against the United States. *Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) (citing *Testan*, 424 U.S. at 398).

Here, the money-mandating source of law identified by plaintiff is an alleged implied-in-fact contract with the OCC pursuant to which Ms. Turner claims she is owed a wire transfer in the amount of $1,850,000.00. *See* Am. Compl. ¶¶ 3, 8, 10-11. An implied-in-fact contract is "'an agreement . . . founded upon a meeting of minds, which, although not embodied in an express contract, is

6

inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" *Barrett Refining Corp. v. United States*, 242 F.3d 1055, 1059 (Fed. Cir. 2001) (quoting *Balt. & Ohio R.R. Co. v. United States*, 261 U.S. 592, 597 (1923)). This court, under the Tucker Act, has jurisdiction over claims against the United States for breach of implied-in-fact contracts. *See, e.g.*, *Hanlin v. United States*, 214 F.3d 1319, 1321 (Fed. Cir. 2000) (citing *Gould v. United States*, 67 F.3d 925, 929 (Fed. Cir. 1995)); *Lewis v. United States*, 70 F.3d 597, 603 (Fed. Cir. 1995).

Nevertheless, a claim founded upon an implied-in-fact contract must be *well-pleaded* to confer jurisdiction upon this court. *See, e.g.*, *Bank of Guam v. United States*, 578 F.3d 1318, 1325 (Fed. Cir. 2009) (stating that "[a] well pleaded allegation of a breach of either an express or implied-in-fact contract is sufficient to overcome challenges to jurisdiction" (citing *Trauma Serv. Grp. v. Unites States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997))). The required elements of an implied-in-fact contract with the United States are: (1) mutuality of intent to contract; (2) consideration; (3) lack of ambiguity in offer and acceptance; and (4) actual authority of a government representative to bind the government in contract. *Lewis*, 70 F.3d at 600 (internal quotation marks omitted) (citing *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990)).

A plaintiff's failure to allege facts supporting each of the required elements of an implied-in-fact contract requires dismissal for lack of subject matter jurisdiction. *See, e.g.*, *Crewzers Fire Crew Transp., Inc. v. United States*, No. 2013-5104, 2014 WL 463780, at *3 (Fed. Cir. Feb. 6, 2014) (holding that plaintiff "failed to present a nonfrivolous allegation that the [blanket purchase agreements] at issue here are binding contracts" because the purchase agreements "reflect illusory promises that do not impose obligations on either party"); *Girling Health Sys., Inc. v. United States*, 949 F.2d 1145, 1147 (Fed. Cir. 1991) (affirming the RCFC 12(b)(1) dismissal of plaintiff's implied-in-fact contract claim based on an alleged promise by the government contained in Internal Revenue Service Form 2553 because the form's language "manifests no intent to be bound" and plaintiff "made no allegation suggesting that the United States received the consideration necessary to form a binding contract") (citations omitted); *Twp. of Saddle Brook v. United States*, 104 Fed. Cl. 101, 110 (2012) (dismissing implied-in-fact contract claim for lack of subject matter jurisdiction because plaintiff's amended complaint "fails to establish the elements necessary to demonstrate the existence of an

implied-in-fact contract, such as a mutual intent to contract and an exchange of consideration," and "provides nothing more than bald assertions that the [Army] Corps [of Engineers] made an agreement with plaintiff") (citations omitted); *Gravatt v. United States*, 100 Fed. Cl. 279, 287 (2011) (dismissing implied-in-fact contract claim for lack of subject matter jurisdiction because "[p]laintiff has not pleaded any of the elements of an implied-in-fact contract, rendering his allegation of such a contract frivolous" and, "[i]ndeed, all of plaintiff's allegations are nonsensical"); *Ryan v. United States*, 57 Fed. Cl. 731, 733-34 (2003) (dismissing implied-in-fact contract claim for lack of subject matter jurisdiction because plaintiffs "do not attempt to allege the elements of an implied-in-fact contract," and therefore "[i]t is not clear what plaintiffs' alleged implied-in-fact contract provides"), *appeal dismissed sub nom. Ryan v. Naval Aviation Museum Found.*, 83 F. App'x 335 (Fed. Cir. 2003); *Vanderbeek v. United States*, 41 Fed. Cl. 545, 547 (1998) (dismissing express and implied-in-fact contract claims for lack of subject matter jurisdiction because the plaintiff's pleadings "show that there was no unambiguous acceptance of plaintiff's terms," "indicate no mutuality of intent," and "cannot be read to create a contract with the government").

Additionally, when the moving party has challenged the truth of jurisdictional facts bearing on the existence of an implied-in-fact contract with the United States, the court may make findings of fact pertinent to the existence of such a contract, and may review evidence extrinsic to the pleadings in order to make such findings. *See, e.g.*, *Cent. Freight Lines, Inc. v. United States*, 87 Fed. Cl. 104, 109 (2009) (*Central Freight*) (dismissing plaintiff subcontractor's express and implied-in-fact contract claims for lack of subject matter jurisdiction because, based upon the court's review of bills of lading filed by the subcontractor as well as a declaration filed by the government, the subcontractor "has not presented evidence sufficient to establish that [the prime contractor] had actual authority to bind the United States in contract" (citing *City of El Centro*, 922 F.2d at 820)).

## IV.   Analysis

In support of its motion to dismiss, the government first argues that "[t]he amended complaint contains insufficient allegations to reasonably be construed as alleging the existence of an express or implied contract." Def.'s Mot. at 11. Specifically, defendant contends that "Ms. Turner does not allege that there existed *any* of the elements of a contract between the parties." *Id.* Second, defendant

argues that "the factual assertions contained in Ms. Turner's amended complaint are patently inaccurate, and . . . thus their patent inaccuracy is another reason that the amended complaint does not support the existence of a contract." *Id.* In support of its second argument, the government attaches to its motion the declarations of two OCC employees:  Patricia Pointer, Deputy Comptroller for Human Resources; and Vicki Parkhurst, Director of Accounting in the Office of Management, Financial Management. Def.'s Mot. App. at 1-5.

Ms. Pointer states in her declaration that she is "authorized to access OCC employee records" in her position as Deputy Comptroller for Human Resources, and that her review of such records revealed that the OCC has never employed an individual by the name of "Clarence Frank." Def.'s Mot. App. at 1, Pointer Decl. ¶ 1. Additionally, Ms. Pointer states that although OCC records "show that an individual named Timothy Long was an employee of the agency," they also show that "Mr. Long never held the position 'Assistant Deputy Chief Council' or 'Assistant Deputy Chief Counsel' while employed at the OCC," that Mr. Long "was never employed as an attorney with the OCC," and that Mr. Long's "date of separation from the OCC was July 1, 2011" – *i.e.*, nearly two years before the alleged contract was formed. *Id.* at 1-2, Pointer Decl. ¶ 3. Ms. Pointer further states that she has "personal knowledge of Mr. Long's appearance" and that the document purporting to be a photocopy of Mr. Long's OCC identification card, which plaintiff includes in her appendix, "is not a picture of Mr. Long." *Id.* at 2, Pointer Decl. ¶ 4. Finally, Ms. Pointer avers that she has personal knowledge of the "typical format of OCC government identification cards," and that "the OCC government identification card . . . [included in Ms. Turner's appendix] is not the typical format for OCC government identification cards." *Id.*, Pointer Decl. ¶ 5.

Ms. Parkhurst states that, as Director of Accounting, she is "responsible for overseeing the OCC's financial management and financial resources, which includes managing the OCC's operational accounting functions for disbursements and collections," and therefore she has "knowledge of the OCC's financial practices and procedures." Def.'s Mot. App. at 3-4, Parkhurst Decl. ¶ 2. Ms. Parkhurst states that "[t]he OCC is an independent bureau of the U.S. Department of the Treasury with primary supervisory responsibility over national banks under the National Bank Act of 1864" and, as such, "is charged with ensuring that the banks and savings associations that it regulates operate in a safe and sound manner and in compliance with the laws requiring fair treatment of their customers and fair

access to credit and financial products." *Id.* at 3, Parkhurst Decl. ¶ 1 (citing 12 U.S.C. § l(a) (2012)). Ms. Parkhurst avers that, contrary to the allegations in the amended complaint, the OCC "does not possess wire transfers directed to U.S. Citizens nor does it make and/or request payments on behalf of U.S. Citizens to release wire transfers." *Id.* at 4, Parkhurst Decl. ¶ 3. Additionally, Ms. Parkhurst states that the OCC "does not communicate with the International Monetary Fund (IMF) on behalf of U.S. Citizens, nor does the OCC transfer payments on behalf of U.S. Citizens to the IMF." *Id.*, Parkhurst Decl. ¶ 4. Finally, Ms. Parkhurst asserts that she reviewed the documents included in Ms. Turner's appendix which purport to be official OCC documents and concludes, "[t]o the best of [her] knowledge, [that] these documents are not created by, or used by, the OCC as part of the agency's financial practices and procedures." *Id.*, Parkhurst Decl. ¶ 5.

Relying upon Ms. Pointer's and Ms. Parkhurst's declarations, defendant argues that "Ms. Turner's assertions regarding Mr. Long's involvement with her claim are patently false and inaccurate, and do not support her claim that a contract was entered into between herself and the OCC." Def.'s Mot. at 13. The government further contends that the "Payment Voucher" purportedly prepared by Mr. Long and approved by "Clarence Frank" is a "counterfeit," and therefore "any assertion with respect to a purported 'Clarence Frank' does not support Ms. Turner's allegation that the parties entered into a contract, express or implied." *Id.* at 13-14. Furthermore, based upon Ms. Parkhurst's conclusion that the documents included in Ms. Turner's appendix which purport to be official OCC documents were, in fact, "not created by, or used by, the OCC as part of the agency's financial practices and procedures," defendant argues that such documents "cannot support Ms. Turner's claim that the parties entered into a contract, express or implied." *Id.* at 14. Finally, relying upon Ms. Parkhurst's attestation that the OCC "does not possess wire transfers directed to U.S. Citizens" and "does not communicate with the [IMF] on behalf of U.S. Citizens . . . [or] transfer payments on behalf of U.S. Citizens to the IMF," the government maintains that "Ms. Turner's assertions with respect to communications between the OCC and the IMF are at best inaccurate and at worst the product of fraud." *Id.* at 15. For these reasons, defendant contends that "the amended complaint cannot be read to create a contract between Ms. Turner and the Government" and must therefore be dismissed for lack of subject matter jurisdiction. *Id.* at 16.

In her response to the government's motion to dismiss, Ms. Turner does not challenge Ms. Pointer's and Ms. Parkhurst's declarations except to claim, without any factual or legal support, that "[i]t has to be agreed that the picture [of Mr. Long on the purported photocopy of Mr. Long's OCC identification card] does not appear to be fraudulently prepared and appears very authentic." Pl.'s Resp. at 12. Plaintiff spends the bulk of her response describing, for the first time, e-mail correspondence she allegedly exchanged with an OCC employee named "Aida Carter Plaza," who Ms. Turner claims promised that a wire in the amount of $1,850,000.00 would be deposited in Ms. Turner's bank account if Ms. Turner would submit certain documentation and direct payments of $420.00 and $3,700.00 to bank accounts held by individuals named "Ronald Lustow" and "Lucinda MP Umiamaka," respectively.[6]  Id. at 1-8, 11-14. Plaintiff sets forth the text of these alleged e-mails in her response.  Id. at 1-8. The e-mails each purport to be sent from the address "p.carter@occcentral.org," and contain the closing salutation "Yours in Service" followed by the signature of "Aida Carter Plaza, Director for Bank Information Technology, Office of the Comptroller of the Currency."  Id. Plaintiff contends that the e-mails, together with her submission of the requested documentation and payments of $420.00 and $3,700.00, established an implied-in-fact contract with the United States:

> [T]he Plaintiff has shown that she received a series
> of emails from Mrs. Aida Carter Plaza, in which she
> offered to release a payment to the Plaintiff's account
> upon the receipt of a promissory note and the return of a
> completed Application for Legitimacy on Funds which
> cost the Plaintiff $420. This offer was made to the
> Plaintiff to enable her to receive funds that were housed
> in their possession but in her name to avoid confiscation
> by the US Government. . . . Consideration was given
> with the payment of the $420 which was made into the
> account of Mr. Ronald Lustow as directed by Mrs. Aida
> Carter Plaza as well as the payment of the $3,700.00
> which OCC stated would be forwarded to the

---

[6]/ Although Ms. Turner's allegations concerning her alleged communications with "Aida Carter Plaza" appear in her response brief, rather than in the amended complaint, in view of Ms. Turner's *pro se* status the court will treat such allegations as having been properly set forth in the amended complaint.

11

>International Monetary Fund for the fulfillment of the
>Assurance Letter.

*Id.* at 14-15.

The government replies that "Ms. Turner's assertions with respect to communications with Ms. Plaza are factually erroneous and patently false." Def.'s Reply at 4. In support of this argument, defendant offers the declaration of Aida Plaza Carter, Director of Bank Information Technology at the OCC. *Id.* Ex. A. Ms. Carter states that she has never met or corresponded with Ms. Turner and did not write the e-mails referenced in Ms. Turner's response. *Id.* ¶¶ 3-8. Ms. Carter further asserts that she never uses the closing salutation "Yours in Service," never signs her name as "Aida Carter Plaza," and never uses the e-mail address "p.carter@occcentral.org." *Id.* ¶¶ 5-7. Additionally, she states that the "domain name" used in the e-mails referenced in Ms. Turner's response ("@occcentral.org") is not used by any OCC personnel. *Id.* ¶ 8 ("[T]o the best of my knowledge, OCC e-mail addresses never contain the domain name 'occcentral.org.' Instead, . . . [they] contain the domain name '@occ.treas.gov.'").

The court must agree with defendant that Ms. Turner has failed to present a non-frivolous allegation of an implied-in-fact contract with the United States. The first and most fundamental flaw in the amended complaint is the complete absence of *any* factual allegations as to the basis for the OCC's alleged promise to pay Ms. Turner $1,850,000.00 in exchange for a few thousand dollars. Ms. Turner fails to allege any facts demonstrating any plausible reason for such an uneven (and unbelievable) bargain. Nor does Ms. Turner offer any bases upon which to establish the OCC's authority to strike such a bargain in the first instance. Indeed, the statute authorizing the creation of the OCC, which Ms. Parkhurst references in her declaration, *see* Def.'s Mot. App. at 3, Parkhurst Decl. ¶ 1, provides that the OCC's purpose and mission is to charter, regulate, and supervise national banks – *not* to serve as an intermediary between the IMF and individual U.S. citizens or to hold funds on behalf of individual U.S. citizens. *See* 12 U.S.C. § 1(a) ("There is established in the Department of the Treasury a bureau to be known as the 'Office of the Comptroller of the Currency' which is charged with assuring the safety and soundness of, and compliance with laws and regulations, fair access to financial services, and fair treatment of customers by, the institutions and other persons subject to its jurisdiction."); *Cent. Nat'l Bank of Mattoon v. U.S. Dep't of Treasury*,

912 F.2d 897, 905 (7th Cir. 1990) ("The Comptroller of the Currency . . . has comprehensive authority over national banks. He charters them; he audits them; he enforces the laws relating to them; in short he is charged by the national banking laws with the execution of all laws of the United States relating to the organization, operation, regulation and supervision of national banks.") (citations and internal quotation marks omitted); *First Nat'l Bank of Lamarque v. Smith*, 610 F.2d 1258, 1263-65 (5th Cir. 1980). Plaintiff fails to allege any facts demonstrating that the OCC, as part of its organizational mission and statutory mandate, holds funds directed to, or requests payments on behalf of, individual U.S. citizens. Nor does Ms. Turner allege any facts demonstrating that the OCC communicates with, let alone transfers payments to, the IMF on behalf of individual U.S. citizens.

Furthermore, the "offer" Ms. Turner alleges was made to her lacks the requisite definiteness to form the basis of a binding contract. "As a threshold condition for contract formation, there must be an objective manifestation of voluntary, mutual assent." *Anderson v. United States*, 344 F.3d 1343, 1353 (Fed. Cir. 2003) (citing *Restatement (Second) of Contracts* § 18 (1981)). A contractual offer is characterized by "'the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.'" *Id.* (quoting *Restatement (Second) of Contracts* § 24). In her amended complaint, Ms. Turner alleges that the OCC "contacted [her] and informed her that a wire directed to her was within their possession and requested the completion of an Application for Clearance on Legitimacy of Funds" as well as the payment of $420.00, then subsequently notified her "that the [IMF] put a stop order on the wire" to be lifted upon further payment of "Currency Fluctuation Charges in the amount of $3,700.00." Am. Compl. ¶ 1. In her response to the government's motion to dismiss, Ms. Turner makes additional allegations that she "received correspondence from . . . Mrs. Aida C. Plaza . . . on February 10, 2013 . . . which informed her that a payment [to her] was stopped due to non-compliance with the US Patriot Act," and that she "received additional information on February 15, 2013 informing her that the matter was under investigation and a Proof of Legitimacy of Funds was required [in order to release the payment]." Pl.'s Resp. at 1-2. Plaintiff's allegations in this regard are ambiguous as well as implausible, and fail to demonstrate any intention on the part of the OCC to enter into a contract for the payment of $1,850,000.00 to Ms. Turner.

13

Additionally, plaintiff makes no allegations suggesting that anyone at the OCC acted with authority to bind the government in contract vis-à-vis Ms. Turner. Plaintiff alleges in her amended complaint that unspecified OCC personnel "contacted [her] and informed her that a wire directed to her was within their possession." *See* Am. Compl. ¶ 1. Although Ms. Turner elsewhere identifies Timothy Long and "Aida Carter Plaza" as the OCC personnel with whom she communicated regarding the alleged wire transfer, she offers no allegations as to how these two individuals possessed authority to promise Ms. Turner a payment of $1,850,000.00.

Finally, Ms. Turner fails to allege that she provided any consideration for the OCC's alleged promise to pay her $1,850,000.00. This court and its predecessor have stated that "'in the context of government contracts . . . consideration must render a benefit to the government, and not merely a detriment to the contractor.'" *Quiman, S.A. de C.V. v. United States*, 39 Fed. Cl. 171, 179 (1997) (quoting *Metzger, Shadyac & Schwarz v. United States*, 12 Cl. Ct. 602, 605 (1987)), *aff'd*, 178 F.3d 1313 (Fed. Cir. 1999). Here, Ms. Turner's alleged actions provided no benefit to the government. Although plaintiff contends that her payments of $420.00 and $3,700.00 constitute sufficient consideration to support the existence of a contract, *see* Pl.'s Resp. at 15, the amended complaint describes these payments simply as "required fee[s]" necessary to effectuate the release of the funds allegedly due Ms. Turner, *see* Am. Compl. ¶¶ 1, 7. Ms. Turner has failed to plead any facts suggesting that her alleged payments of $420.00 and $3,700.00 provided any benefit to the government, and therefore has failed to demonstrate any exchange of consideration necessary to form a binding contract.

Plaintiff's failure to present a non-frivolous allegation of an implied-in-fact contract becomes all the more apparent when one considers the declarations of Ms. Pointer, Ms. Parkhurst, and Ms. Carter. As noted *supra*, when the moving party has challenged the truth of jurisdictional facts bearing on the existence of an implied-in-fact contract with the United States, the court may make findings of fact pertinent to the existence of such a contract. *See, e.g., Central Freight*, 87 Fed. Cl. at 109. Furthermore, in making findings of fact pertinent to its jurisdiction, the court is not limited to the pleadings but may consider extrinsic evidence such as declarations. *See id.; Rocovich*, 933 F.2d at 994 (citations omitted). Here, by offering the declarations of Ms. Pointer, Ms. Parkhurst, and Ms. Carter, defendant has challenged the truth of jurisdictional facts alleged by Ms. Turner. Based upon

14

those declarations, the court finds that the individuals with whom Ms. Turner allegedly corresponded were not OCC personnel, and therefore were not vested with the requisite authority to bind the United States in contract.[7]

Having failed to allege facts which would support any of the required elements of an implied-in-fact contract, Ms. Turner cannot identify any money-mandating source entitling her to the relief she seeks, and therefore has failed to demonstrate this court's jurisdiction over her claim. Plaintiff's amended complaint must therefore be dismissed pursuant to RCFC 12(b)(1) for lack of subject matter jurisdiction.

## CONCLUSION

For all of the foregoing reasons, the court concludes that Ms. Turner has failed to demonstrate any basis for the court's jurisdiction. Her amended complaint must therefore be dismissed pursuant to RCFC 12(b)(1). Accordingly, it is hereby **ORDERED** that

(1) Defendant's Motion to Dismiss, filed September 16, 2013, is **GRANTED**;

---

[7] The court also notes that the amended complaint alludes to the supposed "negligence" of OCC personnel. *See* Am. Compl. ¶¶ 3 ("Mr. Timothy Long's refusal to pay the IMF the $3,700.00 placed the Comptroller of the Currency in breach of the implied in-fact contract and is liable for the damage[s] that the Plaintiff has sustained due to his negligence . . . ."), 11 ("The wire was not received due to the negligence of the Office of the Comptroller of the Currency and the refusal to make payment of the $3,700.00 to the IMF to remove the stop order to release her wire . . . ."). To the extent that the amended complaint could be construed as claiming that the government acted negligently – a claim which sounds in tort – the court lacks jurisdiction over any such claim. *See* 28 U.S.C. § 1491(a)(1) (conferring jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases *not sounding in tort*") (emphasis added); *Shearin v. United States*, 992 F.2d 1195, 1197 (Fed. Cir. 1993) ("It is well settled that the United States Court of Federal Claims lacks – and its predecessor the United States Claims Court lacked – jurisdiction to entertain tort claims." (citing 28 U.S.C. § 1491(a)(1) (1988))); *Burtt v. United States*, 176 Ct. Cl. 310, 313-14 (1966) ("[A] party cannot bring a tortious claim within this court's jurisdiction by framing it in implied contract.") (citation omitted).

15

(2)     The Clerk's Office is directed to **ENTER** final judgment in favor of
defendant **DISMISSING** the amended complaint **without prejudice**;
and

(3)     Each party shall bear its own costs.

Lynn J. Bush
Senior Judge

16